**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION**

| | |
|---|---|
| THE VLADIMIR GUSINSKY REV. TRUST, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| | ) Case No. _____ |
| Plaintiff, | ) |
| | ) JURY TRIAL DEMANDED |
| v. | ) |
| | ) CLASS ACTION |
| LMI AEROSPACE, INC., GERALD E. DANIELS, JOHN S. EULICH, DANIEL G. KORTE, SANFORD S. NEUMAN, JUDITH W. NORTHUP, JOHN M. ROEDER, STEVEN SCHAFFER, GREGORY L. SUMME, LARRY RESNICK,  SONACA S.A., SONACA USA INC., and LUMINANCE MERGER SUB, INC., | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by its undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to itself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action stems from a proposed transaction announced on February 17, 2017 (the "Proposed Transaction"), pursuant to which LMI Aerospace, Inc. ("LMI" or the "Company") will be acquired by Sonaca S.A., Sonaca USA Inc., and Luminance Merger Sub, Inc. (collectively "Sonaca").

2.      On February 16, 2017, LMI's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Sonaca.  Pursuant to the terms of the Merger Agreement, shareholders of LMI will receive $14.00 in cash for each share of LMI common stock.

3.      On March 15, 2017, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of LMI common stock.

9.      Defendant LMI is a Missouri corporation and maintains its principal executive offices at 411 Fountain Lakes Blvd., St. Charles, Missouri 63301.  LMI's common stock is traded on the Nasdaq GS under the ticker symbol "LMIA."

10.     Defendant Gerald E. Daniels ("Daniels") has served as a director of LMI since July 2014 and as Chairman of the Board since April 2015.  According to the Company's website, Daniels is a member of the Audit Committee.

11.     Defendant John S. Eulich ("Eulich") has served as a director of LMI since August 2005.  According to the Company's website, Eulich is Chair of the Corporate Governance and Nominating Committee and a member of the Audit Committee and the Compensation Committee.

12.     Defendant Daniel G. Korte ("Korte") has served as Chief Executive Officer ("CEO") of LMI since March 2014 and as a director since August 2014.

13.     Defendant Sanford S. Neuman ("Neuman) has served as a director of LMI since 1984.  According to the Company's website, Neuman is a member of the Corporate Governance and Nominating Committee.

14.     Defendant Judith W. Northup ("Northup") has served as a director of LMI since May 2006.   According to the Company's website, Northup is Chair of the Compensation Committee.

15.     Defendant John M. Roeder ("Roeder") has served as a director of LMI since 2003.  According to the Company's website, Roeder is Chair of the Audit Committee.

16.     Defendant Gregory L. Summe ("Summe") has served as a director of LMI since July 2014.   According to the Company's website, Summe is a member of the Compensation Committee and the Corporate Governance and Nominating Committee.

17.     Defendant Steven Schaffer ("Schaffer") has served as a director of LMI since March 2015.   According to the Company's website, Schaffer is a member of the Audit Committee and the Compensation Committee.

18.     Defendant Larry Resnick ("Resnick") has served as a director of LMI since January 2017.  According to the Company's website, Resnick previously worked with LMI's Board of Directors as a special adviser to the independent directors since 2010.

19.     The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20.     Defendant Sonaca S.A. is a limited liability company existing under the laws of Belgium.

21.     Defendant Sonaca USA Inc. is a Delaware corporation, a direct wholly-owned subsidiary of Sonaca S.A., and a party to the Merger Agreement.

22.     Defendant Luminance Merger Sub, Inc. is a Missouri corporation, an indirect wholly-owned subsidiary of Sonaca S.A., and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action on behalf of itself and the other public stockholders of LMI (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

24.     This action is properly maintainable as a class action.

25.     The Class is so numerous that joinder of all members is impracticable.  As of February 15, 2017, there were approximately 13,179,190 shares of LMI common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

26.     Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

27.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

28.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

29.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

***Background of the Company and the Proposed Transaction***

30.     LMI is a leading supplier of structural assemblies, kits, and components and a provider of design engineering services to the commercial, business and regional and defense aerospace markets.

31.     The Company fabricates, machines, finishes, kits, and assembles machined and formed close tolerance aluminum, specialty alloy, and composite components.

32.     LMI also provides engineering and program management services, supporting aircraft product lifecycles from design to fleet support via complete turnkey engineering

solutions.

33.    On November 7, 2016, LMI issued a press release announcing its results for the third quarter ended September 30, 2016.  The Company reported that, during the third quarter, the Company was awarded an additional $85,000 per shipset in new content on the Boeing 777X, and expanded machining capacity at its Fredonia, Kansas facility in preparation for expected production rate increases starting in 2017.  LMI further reported that, in the large commercial aircraft market, sales of the Bombardier C-Series and Boeing 787 increased by $2.1 million and $1.1 million, respectively.  In the press release, the Company announced revenue outlook for 2017 of $370 to $400 million, representing a substantial increase over 2016 guidance of $345 to $355 million.

34.    With respect to the results, Individual Defendant Korte, CEO of the Company, commented:

> We improved third quarter sales, operating profit and net income over the previous three quarters[.] We also recently announced the delivery of our first Honda Jet aileron and flap assemblies in the quarter. These results demonstrate progress toward our strategic goals. We took another step toward achieving our long-term growth plans by winning an additional $85,000 per shipset in content on the Boeing 777X. With these latest wins, LMI now has more than $135,000 of new content on this platform, and we continue to pursue other 777X opportunities.

35.    Nevertheless, the Board caused the Company to enter into the Merger Agreement, pursuant to which LMI will be acquired for inadequate consideration.

36.    The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 6.02(b) of the Merger

Agreement states:

(b) Except as may relate to any Qualified Purchaser (but only for as long as such Person or group is a Qualified Purchaser) or as expressly permitted by this Section 6.02, after the Go-Shop Period End Date until the Effective Time or, if earlier, the termination of this Agreement, the Company shall not and shall cause its Subsidiaries not to, and the Company shall direct its and their Representatives not to, directly or indirectly: (i) initiate, solicit, knowingly encourage or facilitate (including by way of providing information) the submission or making of any requests, inquiries, proposals or offers that constitute or could reasonably be expected to lead to, any Acquisition Proposal or engage in, enter into, continue or otherwise participate in any discussions or negotiations with respect thereto or otherwise cooperate with or assist or participate in, or facilitate, any such requests, proposals, offers, discussions or negotiations or furnish to any Person any nonpublic information in furtherance of or afford access to the books or records or directors, officers, employees or other Representatives of the Company or any of its Subsidiaries to any Person with respect to, any proposal or offer that constitutes, or could reasonably be expected to result in any Acquisition Proposal; (ii) except as expressly permitted by Section 6.02(f), approve, endorse or recommend, or publicly propose to approve, endorse or recommend, an Acquisition Proposal, or enter into any confidentiality agreement, merger agreement, letter of intent, agreement in principle, purchase agreement, option agreement or other agreement providing for or relating to an Acquisition Proposal (other than an Acceptable Confidentiality Agreement as set forth in, and if permitted pursuant to, the provisions of Section 6.02(c)) or enter into any agreement or agreement in principle requiring the Company to abandon, terminate or fail to consummate the Transactions or breach its obligations hereunder or propose or agree to do any of the foregoing; (iii) take any action to make the provisions of any Takeover Law inapplicable to any transaction contemplated by an Acquisition Proposal; (iv) terminate, amend, release, modify or fail to enforce any provision of, or grant any permission, waiver or request under, any standstill, confidentiality or similar agreement entered into by the Company in respect of or in contemplation of an Acquisition Proposal (other than, until the receipt of the Shareholder Approval, to the extent the Board of Directors determines in good faith, after consultation with its outside financial and legal advisors, that failure to take any of such actions under this clause (iv) would reasonably be expected to be inconsistent with its fiduciary duties to the holders of Company Common Stock under applicable Law), or (v) publicly propose to do any of the foregoing. Except as may relate to any Qualified Purchaser or as expressly permitted by this Section 6.02, the Company shall, shall cause its Subsidiaries to, and shall cause its and their Representatives to immediately cease and terminate, any solicitation, knowing encouragement, discussion or negotiation or cooperation with, or assistance or participation in, or facilitation of any such inquiries, proposals, discussions or negotiations with, any Persons conducted heretofore by the Company, its Subsidiaries and its and their Representatives with respect to any Acquisition Proposal and promptly request and instruct the prompt return or

destruction of all confidential information previously furnished to any such Person, and the Company shall take all reasonably necessary actions to secure its rights and ensure the performance of any such Person's obligations under any applicable confidentiality agreement. The Company shall ensure that its Representatives are aware of the provisions of this Section 6.02, and any violation of the restrictions contained in this Section 6.02 by its Board of Directors (including any committee thereof) or its Representatives (to the extent such Representatives have been directed or authorized by the Company or its Board of Directors to take or fail to take such action in violation of such restrictions) shall be deemed to be a breach of this Section 6.02 by the Company; provided, however, that any actions taken by the Company's Board of Directors (including any committee thereof) or its Representatives that would be deemed a breach of the first two sentences of this Section 6.02(b) had the Company taken such action shall be deemed a breach by the Company solely for purposes of determining whether an Acquisition Proposal resulted from a breach of the first two sentences of this Section 6.02(b).

37.    Further, the Company must promptly advise Sonaca of any proposals or inquiries received from other parties.  Section 6.02(d) of the Merger Agreement states:

(d) Except as may relate to a Qualified Purchaser, following the Go-Shop Period End Date, the Company shall promptly notify Parent if it takes any action described in clauses (A) and (B) of Section 6.02(c), which notice shall include the identity of the Person making the Acquisition Proposal and a copy of the Acquisition Proposal to which such action relates (if made in writing) or the material terms and conditions thereof (if not made in writing) Except as may relate to a Qualified Purchaser, following the Go-Shop Period End Date, the Company shall keep Parent reasonably informed (orally or in writing) on a prompt basis (and in any event within forty-eight 48 hours) of any material developments, material discussions or material negotiations regarding any Acquisition Proposal described in the immediately preceding sentence and, upon the reasonable request of Parent, shall apprise Parent of the status of any discussions or negotiations with respect thereto. None of the Company or any of its Subsidiaries shall, after the date of this Agreement, enter into any agreement that would prohibit them from providing such information or the information contemplated by the last sentence of Section 6.02(a) to Parent.

38.    Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Sonaca a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 6.02(f) of the Merger Agreement provides:

(f) From and after the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.01, and except as otherwise provided for in the immediately following sentence, neither the Board of Directors of the Company nor any committee thereof shall (i) withdraw, qualify or modify or publicly propose to withdraw, qualify or modify in any manner the Recommendation; (ii) if a tender offer or exchange offer for shares of capital stock of the Company that constitutes an Acquisition Proposal is commenced, fail to recommend against acceptance of such tender offer or exchange offer by the shareholders of the Company (including, for these purposes, by taking no position with respect to the acceptance of such tender offer or exchange offer by the holders of Company Common Stock, which shall constitute a failure to recommend against acceptance of such tender offer or exchange offer) within ten (10) Business Days after commencement thereof pursuant to Rule 14d-2 under the Exchange Act; (iii) approve or recommend or propose publicly to approve or recommend an Acquisition Proposal; or (iv) approve or recommend, or publicly propose to approve or recommend, or execute any letter of intent, agreement in principle, acquisition or other agreement relating to any Acquisition Proposal (other than an Acceptable Confidentiality Agreement) (any of the actions specified in (i), (ii), (iii) or (iv) a "Change of Recommendation"). Notwithstanding anything to the contrary herein, the Board of Directors may at any time prior to the time Shareholder Approval has been obtained, (A) effect a Change of Recommendation if, as a result of an event, development or change in circumstances that first occurs, arises or becomes known after the date of this Agreement (other than the receipt, existence or terms of any Acquisition Proposal, which is subject to clause (B) below, or any matter relating thereto or consequence thereof), the Board of Directors determines in good faith, after consultation with its outside legal counsel and financial advisors, that the failure to take such action would reasonably be expected to be inconsistent with its fiduciary duties to the holders of Company Common Stock under applicable Law or (B) effect a Change of Recommendation or terminate this Agreement to enter into a definitive Alternative Acquisition Agreement, in each case described in this clause (B), with respect to a Superior Proposal, if (1) the Company receives a bona fide written Acquisition Proposal which the Board of Directors concludes in good faith, after consultation with outside legal counsel and financial advisors, constitutes a Superior Proposal after giving effect to all of the adjustments to the terms of this Agreement which may be offered by Parent pursuant to clause (ii) below, and (2) the Board of Directors determines in good faith (after consultation with outside legal counsel and financial advisors) that the failure to take such action would reasonably be expected to be inconsistent with its fiduciary duties to the holders of Company Common Stock under applicable Law; provided, however, that, in the case of the foregoing clauses (A) and (B) the Board of Directors may not effect or make a Change of Recommendation or, as applicable, terminate this Agreement pursuant to this Section 6.02(f) and Section 8.01(f) unless, in the case of clause (B) above, such Superior Proposal did not result in any material respect from a breach by the Company of the first two

sentences of Section 6.02(b), and, in the case of clauses (A) and (B) above:

(i) the Company shall have provided prior written notice to the Parent Entities of its intention to effect or make a Change of Recommendation or terminate this Agreement as contemplated by this Section 6.02(f) at least four Business Days in advance of taking such action (the "Notice Period"), which notice shall include, in the case of clause (B) above, an unredacted copy of such Superior Proposal (including the identity of the Person making such Superior Proposal), and shall have contemporaneously provided a copy of then-current form of all relevant transaction agreements relating to such Superior Proposal (and any debt and equity financing materials related thereto that were provided to the Company); and

(ii) prior to effecting or making a Change of Recommendation or terminating this Agreement to enter into a proposed definitive agreement with respect to such Superior Proposal, (x) the Company shall have negotiated, and shall have directed its Representatives to negotiate, during the Notice Period, with the Parent Entities in good faith (to the extent the Parent Entities desire to negotiate) to make adjustments to the terms and conditions of this Agreement, (y) the Board of Directors shall have considered in good faith (after consultation with its outside legal counsel and financial advisors) any adjustments to this Agreement submitted in writing by the Parent Entities during the Notice Period, and (z) the Board of Directors shall have determined in good faith that, after giving effect to such adjustments, the Superior Proposal still constitutes a Superior Proposal (in the case of clause (B) above) or it would reasonably be expected to be inconsistent with its fiduciary duties to the holders of Company Common Stock under applicable Law to not effect a Change in Recommendation.

In the event of any material revision to the terms of any such Superior Proposal or any Acquisition Proposal that the Company's Board of Directors determines no longer constitutes a Superior Proposal, including any change in any price term thereof, the Company shall be required to deliver a new written notice to the Parent Entities and to again comply with the requirements of this Section 6.02(f) with respect to such new written notice, and a new Notice Period shall commence with respect to such notice (except that the reference to "four Business Days" in the definition of Notice Period shall be deemed to be a reference to "two Business Days").

39.     Further locking up control of the Company in favor of Sonaca, the Merger Agreement provides for a "termination fee" of up to $15 million, payable by the Company to Sonaca if the Individual Defendants cause the Company to terminate the Merger Agreement.

40.     By agreeing to all of the deal protection devices, the Individual Defendants have

locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

41.     The consideration to be provided to plaintiff and the Class in the Proposed Transaction is inadequate.

42.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

43.     The merger consideration also fails to adequately compensate the Company's stockholders for the significant synergies that will result from the Proposed Transaction.

44.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

45.     Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

46.     For example, Individual Defendant Korte, as well as Clifford C. Stebe, Jr., Vice President and Chief Financial Officer of the Company, entered into employment agreements with Sonaca, pursuant to which they will retain employment positions following the consummation of the Proposed Transaction.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

47.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

48.     The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

49.     *First*, the Proxy Statement omits material information regarding LMI's financial

projections and the financial analyses performed by the Company's financial advisor, Lazard Frères & Co. LLC ("Lazard"), in support of its so-called fairness opinion.

50.     For example, with respect to Lazard's Selected Comparable Company Multiples Analysis, the Proxy Statement fails to disclose the individual multiples and financial benchmarking metrics for each of the companies observed by Lazard in its analysis. Further, the Proxy Statement indicates that Lazard selected and applied certain ranges of enterprise values to EBITDA multiples supposedly based on its selected comparable companies to the "estimated Adjusted EBITDA of the Company for 2016, 2017 and 2018, as described in the section of this proxy statement captioned *"—Management Projections."*," but the Proxy Statement fails to disclose which of the three sets of Adjusted EBITDA projections Lazard applied those multiples to.

51.     With respect to Lazard's Selected Precedent Transactions Multiples Analysis, the Proxy Statement fails to disclose the individual multiples and financial benchmarking metrics for each of the transactions observed by Lazard in its analysis.

52.     With respect to Lazard's Discounted Cash Flow Analysis - Risk-Adjusted January 2017 Plan, the Proxy Statement fails to disclose several material key inputs that formed the basis of its analysis. *First*, the Proxy Statement fails to disclose the inputs and assumptions underlying Lazard's calculation of the Company's weighted average cost of cost of capital, which formed the basis for the discount rate range of 8.25% to 9.25% used by Lazard in its analysis. *Second*, although the Proxy Statement indicates that "Lazard calculated the discounted cash flow value for the Company as the sum of the net present value of each of," among other things, "the estimated amounts of utilized net operating loss carry-forwards of the Company for each of years 2017 through 2020," the Proxy Statement fails to disclose the Company's projected 2017

through 2020 net operating loss carry-forwards, or the present values of those net operating loss carry-forwards, as derived by Lazard and used in its analysis. *Third*, the Proxy Statement fails to disclose Lazard's basis for applying exit EBITDA multiples ranging from 7.00x to 8.50x to derive the Company's terminal value, despite indicating that Lazard selected these exit EBITDA multiples ranges "by reference to enterprise value to 2016 EBITDA multiples calculated for the LMI comparable companies," which actually ranged from 6.9x to 9.7x. *Fourth*, the Proxy Statement fails to disclose the perpetuity growth rates that were implied from Lazard's analysis.

53.    With respect to Lazard's Discounted Cash Flow Analysis - January 2017 Plan, the Proxy Statement fails to disclose the unlevered free cash flows used by Lazard in its analysis.

54.    Additionally, the Proxy Statement states that, in a letter sent to the Company on November 4, 2016, Sonaca stated that it "was familiar with the Company's business and described a number of perceived corporate and business synergies between the Company and Sonaca." The Proxy Statement fails to indicate whether Lazard valued these synergies or incorporated them into its valuation analyses and, if so, the Proxy Statement fails to quantify these synergies. If Lazard did not, the Proxy Statement should provide stockholders with an explanation for Lazard's failure to do so.

55.    Further, the Proxy Statement indicates that, on February 8, 2017, the management teams of LMI and Sonaca, along with their respective financial advisors, discussed "additional business updates, including various opportunities in the Company's business pipeline that were not reflected in the Company's 2016 year-end financial results," but it fails to disclose whether Lazard valued these opportunities in the Company's business pipeline or incorporated them into its valuation analyses and, if so, the Proxy Statement fails to quantify these synergies. If Lazard did not, the Proxy Statement should provide stockholders with an explanation for Lazard's

failure to do so.

56.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

57.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Opinion of Lazard Frères & Co. LLC" and (ii) "Management Projections."

58.     *Second*, the Proxy Statement omits material information regarding potential conflicts of interest of Lazard.

59.     For example, although the Proxy Statement indicates that "Lazard has provided certain financial advisory services to Société Régionale d'Investissement de Wallonie, an affiliate of Parent," it fails to disclose the specific nature and timing of those services.

60.     Additionally, the Proxy Statement completely fails to disclose whether Lazard has provided any services to LMI in the past and, if so, the nature, timing, and compensation earned for those services.

61.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

62.     The omission of this material information renders the Proxy Statement false and

misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Opinion of Lazard Frères & Co. LLC" and (ii) "Background of the Merger."

63.     *Third*, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

64.     The Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of LMI's officers and directors, including who participated in all such communications.

65.     Specifically, the Proxy Statement indicates that, on January 11, 2017, Individual Defendant Korte (LMI's President, CEO, and a director) met with the CEO of Sonaca, Bernard Delvaux ("Delvaux"), "over dinner and held general discussions regarding the employment arrangements envisioned for Mr. Korte and potentially certain other executives of the Company if a transaction were to occur." The Proxy Statement, however, fails to disclose the identity of the "other executives" discussed at the meeting.

66.     Similarly, the Proxy Statement states that, on January 28, 2017, the LMI committee "discussed certain other terms of the proposal including Sonaca's request for a commitment on new employment contracts with four to six members of the Company management team," but it fails to disclose the identity of the members identified by Sonaca.

67.     Additionally, the Proxy Statement indicates that, between January 18 and 27, 2017, "Korte and Delvaux spoke from time to time by telephone about potential compensation structures for the Company leadership team following a transaction," but it fails to disclose the nature of those "potential compensation structures." Similar discussions were held on February 13, 2017, but the Proxy Statement failed to disclose the substance of those conversations regarding "compensation structure" as well.

68.     The Proxy Statement indicates that, on February 16, 2017, a "member of the Compensation Committee of the Board of Directors presented a report on that committee's independent evaluation of the compensation arrangements involved in the transaction, including the employment agreements to be entered into by Messrs. Korte and Stebe and potentially certain other executives."  Defendants, however, failed to disclose that compensation report, let alone a fair summary of that report.

69.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.  This information, moreover, is particularly material here in light of the fact that Company management lowered the Company's financial projections during the negotiations over the economic terms of the Proposed Transaction.

70.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger" and (ii) "Interests of LMI's Directors and Executive Officers in the Merger."

71.     *Fourth*, the Proxy Statement omits material information regarding the background of the Proposed Transaction.  The Company's stockholders are entitled to an accurate description of the process the directors used in coming to their decision to support the Proposed Transaction.

72.     The Proxy Statement indicates that, on November 12, 2016, the Board determined to establish "an ad hoc board committee" to evaluate the potential transaction with Sonaca, but it fails to disclose the reason the Board deemed it necessary to establish such a committee,

including whether it was due to any perceived conflicts of interest.

73.     The Proxy Statement indicates that, during the short go-shop period following the execution of the Merger Agreement, "Company C" reached out to the Company and Lazard to express its potential interest in participating in the go-shop process, but Company C indicated it was reluctant to sign a confidentiality agreement containing a standstill provision, as required by the Merger Agreement.  The Board, however, determined that it would not seek a waiver from Sonaca of the provision in the Merger Agreement that required confidentiality agreements to contain a standstill provision.  The Proxy Statement fails to disclose the Board's reason for failing to do so, and the substance of any discussions regarding the potential waiver.

74.      The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the "Background of the Merger" section of the Proxy Statement.

75.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to LMI's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and LMI**

76.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

77.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  LMI is liable as the issuer of these statements.

78.     The Proxy Statement was prepared, reviewed, and/or disseminated by the

Individual Defendants.   By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

79.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

80.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

81.     The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

82.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

83.     Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Sonaca

84.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

85.     The Individual Defendants and Sonaca acted as controlling persons of LMI within the meaning of Section 20(a) of the 1934 Act as alleged herein.   By virtue of their positions as officers and/or directors of LMI and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement,

18

they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

86.     Each of the Individual Defendants and Sonaca was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

87.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy Statement.

88.     Sonaca also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

89.     By virtue of the foregoing, the Individual Defendants and Sonaca violated Section 20(a) of the 1934 Act.

90.     As set forth above, the Individual Defendants and Sonaca had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.   As a direct and proximate result of defendants' conduct, plaintiff and the Class are

threatened with irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 24, 2017                         **SWANSON MIDGLEY LLC**

*/s/ John J. Miller*

By: _____

John J. Miller, ED No. 32215MO
4600 Madison Avenue, Suite 1100
Kansas City, MO 64112
Phone (816) 842-6100
Fax (816) 842-0013
jmiller@swansonmidgley.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
(484) 324-6800